Good morning, Your Honours. Matthew Richards for the petitioner Nasser Farah Ali. I'd like to reserve two minutes for rebuttal. Whenever Mr. Ali has had an opportunity to speak for himself, he has provided a single, consistent narrative about the persecution that he suffered in Somalia. He's been consistent in his written application, his declarations, and in testimony before the immigration judge, both on direct and cross-examination, about his father's and brother's murders by the United Somali Congress, about being forced to flee from his hometown and hide in the bush when the United Somali Congress took it over, about his kidnapping by members of Al-Aqqad, a Muslim fundamentalist group, about his death sentence that he received from a Muslim sharia court based on his political and religious beliefs, his escape from captivity, and his flight to Kenya. Now, in the face of that consistent narrative of persecution, the immigration judge made an adverse credibility finding based solely upon alleged inconsistencies at the asylum office interview, all of which were the product of faulty interpretation by an incompetent interpreter. This case has – Normally, can I ask you about that? Normally, when these cases come up, it's the faulty interpretation at a hearing. So you have a transcript, and then you can kind of see where the problems are? Correct, Your Honour. How do we judge it in this somewhat unique situation? Well, in this situation, because there is no record of that translation at the asylum office, what the immigration judge needed to do and should have done was to certify that the translation was correct. Now, she attempted to do that by having the interpreter come in and testify in front of her. And in doing so, she was able to assess his English-language capabilities. Now, we argue, and the record is clear, that substantial evidence does not support a finding that he was competent as an English speaker. But moreover, she also needed to certify that he was competent to translate into and out of Somali. And there is no evidence in the record that she did that. That should be the standard that should guide immigration judges in, as you acknowledge, the unusual situation where they're relying on an asylum office interview instead of testimony that's taken before them. Do you have any other cases that are even close to this that we might look at for guidance? Your Honour, in terms of cases involving asylum office testimony used as the basis, we found nothing in the adverse credibility decisions of this Court either affirming or overturning adverse credibility findings that were based on this particular issue, the asylum office translation. Everything else is based on testimonies taken before the immigration judge or discrepancies between a written statement and later testimony before that judge or things of that sort. We believe that the ---- If you're correct, is this something that should be remanded for the appropriate translation determinations to be made? That's one way that Your Honour could resolve it. But because the immigration judge's decision in this case was predicated solely upon his adverse credibility and that was related only to the asylum office testimony, because she did not properly certify it, she was not entitled to make that determination and, therefore, he should be found credible. And because that was the only basis, we believe that this case should just simply be reversed. What do you mean by certify? She heard his testimony and apparently found him credible and qualified and, therefore, didn't implicitly, by admitting it, determine that it was sufficient for her to consider. Your Honour, two things are raised by that question. The first is his capabilities in English, and the record is clear that he was not capable as an English speaker. For example, he requested or he was asked if he wanted a Somali interpreter and would have accepted it before he was sworn in to testify as to his Somali to English translation capabilities. And he was also giving nonsensical responses, such as being asked to state his full name for the record and saying, yes, I do, or being asked the first question on her oath was, do you know Mr. Ali? Have you met Mr. Ali? And his response was, no, I haven't seen him before. So the record is clear that the overwhelming evidence in the record before the immigration judge is that he was not competent as an English speaker. But what we are suggesting is that in future situations, and also in this case, what the immigration judge should have done is to certify by bringing in a native speaker of that particular language, in this case Somali, to certify whether or not he is the translator at the asylum interview, was competent to give a translation. Now, if the immigration court doesn't want to do that because it's administratively burdensome, that's fine. All we're saying is that if you have identified problems in the asylum office interpretation, that cannot be used as a basis for an adverse credibility finding unless you make sure that it was completely accurate. I'm following up on Judge Alicorn's question. Are there other aspects of the immigration proceedings where such a certification is required? Your Honor. Is this sort of a one-off thing that you're asking for? This is a unique circumstance, as the fact that there are no analogous cases suggests. And so we believe that this is something of a one-off situation, because the normal procedure is for the immigration judge to take evidence at the hearing from the asylum applicant and have the applicant cross-examined by the government. Now, the judge clearly went beyond that, and not in an impermissible way necessarily. But having gone beyond that, she needed to make sure that the basis for her adverse credibility finding was proper. And in this case, it's not because there are clear problems with the interpretation. One of the things that bothers me about the translation argument is that it's hard to see how just a difference in translation would orient the place where the brothers were killed from the house to a store. Your Honor, once we start going down that road, though, of an improper translation, things continue to sort of spiral out of control. So you've got answers that are supposed to be building off of one another at this asylum interview. But as soon as you introduce translator problems, you're getting answers that are not what is expected to a particular question. And so you're going back and trying to clarify. There's no real basis. And so it's hard to say exactly what did happen at the asylum office interview. But what we do know from the record is that Mr. Ali was consistent at every stage when he was able to speak for himself. Well, I understand that. But what the immigration judge was looking at is that he was disinclined to believe the whole story because the interview was so different. And I think if you believe the whole story, it was pretty harsh, all the things that happened to him and to his wife and mother. But it's hard to see how that relates to an actual mistranslation of something. Well, Your Honor, I would just say that even assuming that the translation was completely proper, the standard in this circuit with respect to minor inconsistencies is such. Yeah, but that's not minor as to where I can see the difference between 1992 and 96 for the father. That could easily be. Right. And it could be minor. But where the brothers were killed, what happened to the wife and mother and when they were found and whether they left together, all those things are not minor. Your Honor, in Singh v. INS, this Court has held that the location of a political rally that the applicant attended was considered minor, where there was a discrepancy as to where that was. And that was the centerpiece of his claim of persecution. And in other cases as well. But a whole story is different. Where some kind of a protest occurred, I could see where that wouldn't be as important as whether it did occur. But here we've got some completely different stories. Your Honor, I would just respectfully suggest that the cases in the circuit regarding minor inconsistencies, including Shaw, Menimbo, Martinez, Sanchez, Bhandari, Singh, which we've all cited in the brief, address this point and say that even if you were to credit the testimony of the asylum office translation, that those would not be considered inconsistencies that go to the heart of his asylum claim and that can properly be the basis of an adverse credibility finding. I see that my time has expired. Thank you. May it please the Court. My name is Melissa Nyman-Kelsing, and I represent the Attorney General of the United States. The Court should deny the instant petition for review because Petitioner has failed to demonstrate that substantial evidence compels a finding that he was credible. Moreover, he has failed to show that the Board abused its discretion in denying his untimely motion to reopen. Finally, he's failed to exhaust his challenge to the execution of his removal order to Somalia. Getting to the Court's point about and Petitioner's point about the certification of the translation before the asylum office, there's no support for that proposition. Moreover, the CFR does provide at 1209.9g that it is the applicant's responsibility to bring in a competent translator. In this case, the immigration judge was concerned about the clear conflict between what the testimony was before her in the courtroom. Is it the applicant's responsibility to bring it in just at the interview stage, or would it be only at the appearance before the IJ? It's the applicant's responsibility at the asylum interview before the asylum officer, the very first step of the process. It is not the applicant's burden before the hearing where the translator is certified to be competent. It's provided by the immigration court, and there is a record of the translation, both recorded and then a written transcript. Well, what does concern me about this is the fact that the translator performed so poorly at the immigration hearing. I mean, he pretty much demonstrated that he was not a good translator. Your Honor, it's true that he did not speak perfectly clear English in his responses, but this Court has found in Hartooni v. INS that broken English is not evidence of translator or interpreter problems. It's sort of odd that you have a translator that needs a translator when he's coming in to testify, and he said he only understood concepts because he was from a different dialect. So you're really left with some of these discrepancies, which are quite clear. It's hard to judge whether those are concepts or translation difficulties or pure discrepancies. And if everything is equally plausible, is that supported by substantial evidence? I have two responses to that, Your Honor. The first is that the judge, as the trier of fact, was in the courtroom, heard the testimony, was able to see, you know, demeanor, body language, and take into account everything as a whole, where it's hard from a dry transcript to understand. And perhaps he was nervous. Perhaps it took a few minutes for him to calm down and testify clearly. Second, going back to your point earlier that the fact that there was such a discrepancy between the circumstances surrounding the brothers' murder, granted some of the dates, you can see how that might be a translation problem. But here we have two totally separate stories of what happened between whether the brothers were killed at a coffeehouse or whether they were killed at the Petitioner's home, the family home. And the judge in weighing all the evidence kind of not knowing this particular dialect, I don't know whether home and coffeehouse have some relation to each other in terms of how they sound. And I don't know whether that's any more different than 1992 and 1996, for example. That's a fair concern, Your Honor. But the record supports finding that the interpreter understood the Petitioner at page 252 and 266 of the record. Granted, he said that they communicated in the official Somali language and that their dialects were different, but that they generally understood each other. Petitioner testified at page 210 of the record that he understood the interpreter. And the asylum officer in her testimony telephonically did state that she didn't see any interpretation problems, that she, granted that she does not speak the Somali language, but that she had been trained in being able to identify if there were some sort of interpretation problems going on. And at page 276 to 278 of the record, she made it clear that she did not feel that there were any improprieties or concerns, nothing that was concerning to her that she needed to have him come back with a different translator, which is in her purview to do. If she felt that there were translation problems, she could say, I don't think that this translator is competent. We need to stop. You need to go back and bring someone who can adequately translate your claim. And she didn't feel that that was a concern in this case. When were the written declarations made? The first declaration, Your Honor, was made with the submission of the asylum application. And that would have been in May of 2000. I believe May 22nd or May 30th of 2000. The first application or declaration came with the asylum application. Then we have the interview, which occurs in August of 2000. Then we have the hearing before the IJ, which occurs in the last hearing, I believe, was before the decision was October of 2000. Then prior to the oral decision, we have the supplemental declaration, which is at 384 to 388 of the record. And that was signed on October 31st of 2000 and submitted in November. So notably after the testimony before the IJ. So it was submitted after he had been alerted to the fact that there were inconsistencies, some significant ones, between his testimony before the immigration judge and his testimony before the asylum officer. But, of course, that's required, isn't it? If you're going to base it on an inconsistency, you have to tell him what it is, so. And he did have an opportunity also at the hearing during his cross-examination by the service counsel and by the immigration judge. Also, the asylum ---- But his affidavit that he submits contemporaneously with his asylum application is consistent with his testimony. Is that correct? The initial asylum application, generally, yes. It's not as detailed, but this Court has found that details aren't sufficient to support an adverse credibility finding. But it is generally consistent, yes. And the IJ found that. She was very clear in her decision, which I think belies Petitioner's contention that there was not a de novo review in this case. She, I believe, pages 160 and 150 through 151, and even if you review the transcript of the hearing itself, indicated that, yes, he was generally consistent in his application and before the testimony before the IJ. Her concern was that there were these significant discrepancies that were being blamed on either a faulty preparer of the asylum application or an incompetent translator, which is why she took the step of bringing the translator in, of bringing the asylum officer in via the phone, to give the Petitioner an opportunity to cross-examine and explain these inconsistencies, which he'd had an opportunity to do at the asylum office, and then he had an opportunity again to do before, on the record, with a competent translator certified by the Immigration Court, on the record before the Immigration Court. But he did at that time, didn't he? His general explanations were that identical to those things are virtually identical to the written declaration. His general explanations were the interpreter got it wrong. I never said that. That that wasn't what my testimony was. He must have gotten it wrong. And I mean, it's kind of a circular argument, and the Court has to come back to the evidence compels the finding he was credible. The Court's job is not here to re-weigh the evidence. The Court is to look and see if even one ground that the IJ cites to is supported by substantial evidence and goes to the heart of the claim, the adverse credibility finding must stand. And it's a heavy burden, and it's on Petitioner to show that, in this case, the finding is compelled that he was credible. You know, what bothers me is that I find it very strange that a person would appear in an interview and tell an inconsistent story with what was written in the declarations, absent some sort of a translation problem. Why wouldn't he tell the same story there as he did before the Immigration Judge? Well, one response to that would be that his story wasn't true, so he was having trouble remembering what he had written down versus what, if anything, had really happened. There are cases, and this Court has seen cases, where the discrepancies are so great between what happens at the asylum interview and then in the application and what happens before the Immigration Court. And it's true that in this case he was generally consistent before the Immigration Court and in his asylum application, but the process starts at the beginning. The process starts with filing your application and your interview at the asylum office if you file an administrative application. And here the government's position is that the record does not compel a finding, and Petitioner has not met his burden, showing that the evidence compels a finding that he is credible. Thank you. Thank you, Your Honors. The question, Your Honors, is whether there are any inconsistencies in this record at all on which an adverse credibility finding can be made. Mr. Ali told a consistent story of persecution at every opportunity that he was given to speak for himself. He was consistent before in his written application, in his declarations, and before the Immigration Judge.  and if he had had any inconsistencies, if he had an opportunity to speak for himself at the asylum office, his story would have been the exact same there as well. There's overwhelming objective evidence in the record demonstrating that the asylum office interview is at best of dubious quality because of the faulty interpretation. Yet this is the only basis on which the Immigration Judge made her adverse credibility finding. It was a translation that was made by a man who didn't quite either speak the And as this Court has held in Delorio Lopez, Osorio, Bhandari, He, Singh, and others, this is an impermissible basis for an adverse credibility decision. The decision of the Immigration Judge should be reversed. Thank you. I thank both counsel for your arguments. The case of Ali v. Gonzales is submitted.
judges: Hug, Alarcon, McKeown